UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

RAMONA GAIL HARMON                    CIVIL ACTION NO. 6:14-cv-02660

VERSUS                                JUDGE DOHERTY

U.S. COMMISSIONER,                    MAGISTRATE JUDGE HANNA
SOCIAL SECURITY
ADMINISTRATION

## REPORT  AND  RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be REVERSED AND

REMANDED.

### ADMINISTRATIVE PROCEEDINGS

The claimant, Ramona Gail Harmon, fully exhausted her administrative

remedies prior to filing this action in federal court.  The claimant filed an application

for disability insurance benefits ("DIB") and an application for supplemental security

income benefits ("SSI"), alleging disability beginning on February 4, 2006.[1]  Her

applications were denied.[2]  The claimant requested a hearing,[3] which was held on

---

[1]    Rec. Doc. 9-1 at 120, 122.

[2]    Rec. Doc. 9-1 at 55, 56.

[3]    Rec. Doc. 9-1 at 76.

March 25, 2013 before Administrative Law Judge Carol Lynn Latham.[4]  The ALJ

issued a decision on June 20, 2013,[5] concluding that the claimant was not disabled

within the meaning of the Social Security Act ("the Act") from February 4, 2006[6]

through the date of the decision.  The claimant asked for review of the decision, but

the Appeals Council concluded on July 21, 2014 that no basis existed for review of

the ALJ's decision.[7]  Therefore, the ALJ's decision became the final decision of the

Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g).

The claimant then filed this action seeking review of the Commissioner's decision.

## FACTUAL BACKGROUND

The claimant was born on April 29, 1965.[8]  At the time of the ALJ's decision,

she was forty-eight years old.  She quit school in the eighth grade but later obtained

---

[4]     The hearing transcript is found at Rec. Doc. 9-1 at 36-53.

[5]     Rec. Doc. 9-1 at 18-31.

[6]     The record indicates that Ms. Harmon filed a previous application for Social Security benefits, alleging a disability onset date of February 4, 2006.  A potential onset date of February 4, 2006 was used in connection with that application based on the dates of an unsuccessful work attempt.  The record shows that Ms. Harmon returned to work thereafter, and worked from June 2010 until August 22, 2011.  Therefore, a potential onset date of August 22, 2011 was suggested for the instant application.  Rec. Doc. 9-1 at 210.  In her ruling, the ALJ noted that Ms. Harmon did not have earnings in the substantial gainful activity level for the entire time period from February 4, 2006 forward, pretermitted making a decision based on work activity, and found that Ms. Harmon was not disabled from February 4, 2006 through the date of the decision.

[7]     Rec. Doc. 9-1 at 5.

[8]     Rec. Doc. 9-1 at 39.

a GED.[9]  She worked most recently as a sitter, and she also has past relevant work experience as a retail cashier, a receptionist and secretary, an assistant manager at a rental business, an outreach worker for a nonprofit organization assisting the elderly, a nutrition aide, and in security at a race track.[10]  She alleges that she has been disabled since February 4, 2006[11] due to lupus, arthritis, back and knee problems, and panic attacks.[12]

The administrative record is voluminous.  It contains records from Mr. Michael Melancon, the claimant's gynecologist.[13]  However, the claimant does not claim to be disabled due to a gynecological condition.  Accordingly, those records will not be summarized here.

X-rays taken on September 19, 2005 at LSU University Medical Center in Lafayette, Louisiana showed a normal lumbar spine.[14]  An MRI of the lumbar spine taken on March 9, 2006 was normal.[15]  On July 24, 2007, the claimant was involved

---

[9]      Rec. Doc. 9-1 at 40.

[10]     Rec. Doc. 9-1 at 41, 49, 134-136, 160, 167, 184,

[11]     Rec. Doc. 9-1 at 122, 126.

[12]     Rec. Doc. 9-1 at 14, 159.

[13]     Rec. Doc. 9-2 at 2-7.

[14]     Rec. Doc. 9-2 at 82.

[15]     Rec. Doc. 9-2 at 388.

in a motor vehicle accident and transported via ambulance to LSU University Medical Center in Lafayette, Louisiana.   X-rays of her cervical and lumbar spine were negative.[16]  X-rays of her left thumb taken on September 26, 2008 were normal.[17]  An MRI of Ms. Harmon's left knee, taken on November 11, 2009, showed a small joint effusion.[18]  Records from American Legion Hospital in Crowley, Louisiana, show that Ms. Harmon underwent a series of lumbar spine x-rays on April 1, 2010, which showed no degenerative changes or other problems.[19]  Right shoulder x-rays taken on December 6, 2010 that were also normal.[20]

The hospital's records also show treatment for gastrointestinal complaints and chest pain that are not alleged to be the basis for the claimant's alleged disability. Those records will not be summarized.

On August 22, 2011, Ms. Harmon was seen in the internal medicine clinic at LSU University Medical Center in Lafayette, Louisiana.[21]  The doctor's impressions were rheumatoid arthritis, systemic lupus erythematosus, obesity, and fibromyalgia.

---

[16]     Rec. Doc. 9-2 at 63-68.

[17]     Rec. Doc. 9-2 at 374.

[18]     Rec. Doc. 9-2 at 336.

[19]     Rec. Doc. 9-2 at 17.

[20]     Rec. Doc. 9-2 at 330.

[21]     Rec. Doc. 9-2 at 56-58.

The treatment notes indicate earlier negative right shoulder and lumbar x-rays as well as a prior diagnosis of a small joint effusion in the left knee.

On September 26, 2011, Ms. Harmon had an MRI of her left knee, which showed joint effusion without a ligament tear and a grade 2 tear in the posterior horn of the medial meniscus.[22]

On October 3, 2011,[23] Ms. Harmon was seen in the emergency department at University Medical Center in Lafayette, Louisiana for complaints of left knee pain that had been ongoing for three years.  Her knee was tender, swollen, and painful. She was diagnosed as having a torn left medial meniscus.  She was given pain medication and referred to the orthopedic clinic in New Orleans.

X-rays of the right shoulder taken at American Legion Hospital in Crowley, Louisiana on January 20, 2012 showed mild osteoarthritis but no fracture or dislocations.[24]

The record shows that Ms. Harmon treated with Dr. Stephen R. Cannon of Crowley, Louisiana, from 2004 through 2013, seeing him approximately once a

---

[22]    Rec. Doc. 9-2 at 327.

[23]    Rec. Doc. 9-2 at 49-55.

[24]    Rec. Doc. 9-2 at 559.

month.  The records for the relevant time period for the instant application, i.e., August 2011 forward, are summarized below.

On August 10, 2011,[25] Ms. Harmon complained of diffuse aching worse than ever, with pain in her neck and back.  She stated that she would be seeing a rheumatologist later in the month.  However, the administrative record contains no evidence that Ms. Harmon ever saw a rheumatologist.  Upon examination, Dr. Cannon found diffuse stiffness and pain to all joints along with minimal swelling.  Dr. Cannon's assessment was rheumatoid arthritis, and he prescribed medications.

On September 15, 2011,[26] Ms. Harmon complained of pain in her left knee that was worse with activity and right shoulder pain travelling down into her hand as well as swollen hands.  Dr. Cannon diagnosed rheumatoid arthritis and knee pain and prescribed medication.

On September 20, 2011,[27] Ms. Harmon complained of a worsening rash, which Dr. Cannon assessed as herpes/zoster and treated.

---

[25]      Rec. Doc. 9-2 at 113-115.

[26]      Rec. Doc. 9-2 at 109-112.

[27]      Rec. Doc. 9-2 at 105-107.

-6-

On December 16, 2011,[28] Ms. Harmon complained of right arm and shoulder pain and a swollen hand.  Dr. Cannon's examination found mild pain and swelling to her fingers as well as crepitus and pain in her knees.  His assessment was rheumatoid arthritis.

On November 30, 2011, Ms. Harmon complained of pain in her right elbow and knee pain, both of which made motion difficult.  Dr. Cannon noted that she was to have her back pain and anxiety evaluated in Shreveport.  He treated her for a yeast infection to her skin, back pain, rheumatoid arthritis, and anxiety.

On January 19, 2012,[29] Ms. Harmon complained of being barely able to raise her right arm, with no swelling but with a cracking sensation that had progressed over a two week period.  She also complained of weakness and numbness in her right hand.  Dr. Cannon adjusted her medication and assessed her with rash, shoulder pain, and rheumatoid arthritis.

On April 17, 2012,[30] Ms. Harmon complained of skin problems and a worsening of her usual back and knee pain, particularly with range of motion, but no

---

[28]     Rec. Doc. 9-2 at 98-100.

[29]     Rec. Doc. 9-2 at 548-551.

[30]     Rec. Doc. 9-2 at 555-558.

weakness or numbness.  Dr. Cannon adjusted her medications, indicating that he was treating her for rheumatoid arthritis and rash.

On May 8, 2012,[31] Dr. Cannon noted that Ms. Harmon had diffuse joint pain and swelling.  He treated her for rheumatoid arthritis, benign hypertension without congestive heart failure, allergic rhinitis, and rash.  He also prescribed medications for migraine headaches.

On July 16, 2012,[32] Dr. Cannon noted mild crepitus in both knees, with pain and swelling. He diagnosed upper respiratory infection, rheumatoid arthritis, lupus, yeast infection of the skin, and migraine headaches.

On July 26, 2012,[33] Ms. Harmon complained of hurting all over, difficulty moving, increased stiffness, and joint swelling.  Dr. Cannon noted that Ms. Harmon had diffuse myalgias, mild crepitus to both knees, and mild swelling to her fingers bilaterally.  He prescribed medication for her rheumatoid arthritis.

On August 16, 2012,[34] Ms. Harmon told Dr. Cannon that she was stiff, having pain in her right elbow, right fingers, and back, and that her hands were very stiff

---

[31]     Rec. Doc. 9-2 at 603-606.

[32]     Rec. Doc. 9-2 at 599-602.

[33]     Rec. Doc. 9-2 at 595-598.

[34]     Rec. Doc. 9-2 at 591-594.

with limited range of motion.   Dr. Cannon diagnosed rheumatoid arthritis and adjusted her medications.

Ms. Harmon followed up with Dr. Cannon on September 17, 2012.[35]   She complained of pain, stiffness, and migraine headaches with nausea.   Dr. Cannon diagnosed rheumatoid arthritis and migraine, and he prescribed medications for those conditions.

On December 14, 2012,[36] Dr. Cannon noted diffuse soreness and swelling to all joints more pronounced to the knees, hands, and lower back.   He treated Ms. Harmon for rheumatoid arthritis, lower back pain, pharyngitis, and herpes simplex.

On February 8, 2013, Dr. Cannon noted that Ms. Harmon was complaining of bilateral knee pain, that her knees were swollen and stiff, and that she had trouble walking due to rheumatoid arthritis.[37]   Dr. Cannon's assessment was rheumatoid arthritis and knee pain.[38]

The administrative record contains four separate listings of the claimant's medications.  On May 9, 2012, she was taking sixteen prescription drugs; on October

---

[35]      Rec. Doc. 9-2 at 583-586.

[36]      Rec. Doc. 9-2 at 650-653.

[37]      Rec. Doc. 9-2 at 654.

[38]      Rec. Doc. 9-2 at 657.

15, 2012, she was taking seven prescription drugs; on March 19, 2013, she was taking

thirteen prescription drugs plus an over-the-counter medication; and on December 27,

2013, she was taking fourteen prescription drugs plus an over-the counter medication.

The most recent list included the following:

- Hydroxychlorguine for lupus,

- Cymbalta, an anti-depressant,

- Folic acid for anemia,

- Prednisone for inflammation,

- Provastatin for cholesterol,

- Ogesteril for birth control,

- Methocarbirol, a muscle relaxer,

- Azathioprine for arthritis,

plus two medications specifically for headaches – Sumatriptan and Amitriptyline –

as well as five additional medications for pain – over-the-counter Tylenol plus

Meloxicam, Ketamine, Ketorolac, and Oxycodone/Acetaminaphen.

Dr. Cannon's records do not include a functional analysis nor is there a

functional analysis by any other health care provider included in the administrative

record.

-10-

## ANALYSIS

### A.   STANDARD OF REVIEW

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[39]  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[40]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[41]

If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed.[42]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the

---

[39]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[40]    *Villa v. Sullivan*, 895 F.2d at 1021-22 (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

[41]    *Hames v. Heckler*, 707 F.2d at 164 (quoting *Hemphill v. Weinberger*, 483 F.2d 1137. 1139 (5th Cir. 1973), and *Payne v. Weinberger*, 480 F.2d 1006, 1007 (5th Cir. 1973)).

[42]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

evidence or substituting its judgment for that of the Commissioner.[43]  Conflicts in the evidence and credibility assessments are for the Commissioner to resolve, not the courts.[44]   Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:   (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education, and work experience.[45]

## B.   ENTITLEMENT TO BENEFITS

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[46]

---

[43]      *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1021; *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Carey v. Apfel*, 230 F.3d at 135; *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001).

[44]      *Martinez v. Chater*, 64 F.3d at 174.

[45]      *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991); *Martinez v. Chater*, 64 F.3d at 174.

[46]      See 42 U.S.C. § 423(a).

Every individual who meets certain income and resource requirements, has filed an application for benefits, and is determined to be disabled is eligible to receive Supplemental Security Income ("SSI") benefits.[47]

The terms "disabled" and "disability" refer to the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[48]   A claimant shall be determined to be disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work that exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[49]

---

[47]     42 U.S.C. § 1382(a)(1) & (2).

[48]     42 U.S.C. § 1382c(a)(3)(A).

[49]     42 U.S.C. § 1382c(a)(3)(B).

## C.    EVALUATION PROCESS AND BURDEN OF PROOF

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled.  At step one, an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings. At step two, an individual who does not have a severe impairment will not be found disabled.  At step three, an individual who meets or equals an impairment listed in the regulations at 20 C.F.R. Part 404, Subpart P, Appendix 1 will be considered disabled without consideration of vocational factors.  If an individual is capable of performing the work he has done in the past, a finding of not disabled will be made at step four. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity will be considered to determine if the claimant can perform any other work at step five.[50]

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[51] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the

---

[50]      20 C.F.R. § 404.1520; see, e.g., *Wren v. Sullivan*, 925 F.2d at 125; *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Masterson v. Barnhart*, 309 F.3d 267, 271-72 (5th Cir. 2002); *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

[51]      20 C.F.R. § 404.1520(a)(4).

record.[52]   The claimant's residual functional capacity is used at the fourth step to

determine if he can still do his past relevant work and at the fifth step to determine

whether he can adjust to any other type of work.[53]

The claimant bears the burden of proof on the first four steps.[54]   At the fifth

step, however, the Commissioner bears the burden of showing that the claimant can

perform other substantial work in the national economy.[55]   This burden may be

satisfied by reference to the Medical-Vocational Guidelines of the regulations, by

expert vocational testimony, or by other similar evidence.[56]   If the Commissioner

makes the necessary showing at step five, the burden shifts back to the claimant to

rebut this finding.[57]   If the Commissioner determines that the claimant is disabled or

not disabled at any step, the analysis ends.[58]

---

[52]     20 C.F.R. § 404.1545(a)(1).

[53]     20 C.F.R. § 404.1520(e).

[54]     *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[55]     *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[56]     *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[57]     *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[58]     *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992), citing *Johnson v. Bowen*, 851 F.2d 748, 751 (5th Cir. 1988).  See, also, 20 C.F.R. § 404.1520(a)(4).

**D.    THE ALJ'S FINDINGS AND CONCLUSIONS**

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since February 4, 2006.[59]  This finding is supported by the evidence in the record.

At step two, the ALJ found that the claimant has the following impairments: obesity, anxiety, depression, hypertension, lupus, rheumatoid arthritis, left knee joint effusion and grade 2 tear in the posterior horn of the medial meniscus but she also found that none of these impairments is severe.[60]  The claimant challenges this finding.  Having found, at step two, that the claimant is not disabled, the ALJ did not proceed through the remaining steps of the analysis.  The ALJ did not evaluate whether the claimant has an impairment or combination of impairments that meets or medically equals the severity of a listed impairment, did not evaluate whether the claimant can perform her past relevant work, did not evaluate whether there are other jobs that the claimant can perform, and did not evaluate the claimant's residual functional capacity.  The claimant challenges the ALJ's step two finding of no disability.

---

[59]       Rec. Doc. 9-1 at 22.

[60]       Rec. Doc. 9-1 at 22-23.

E.    THE ALLEGATIONS OF ERROR

Although poorly articulated, the claimant appears to be contending that the ALJ erred in finding that she has no severe impairments and no combination of impairments that severely affect her functionality.  The claimant also argues that the ALJ should have elicited testimony from a vocational expert concerning her ability to maintain regular employment.  Finally, the claimant argues that the ALJ erred by improperly evaluating her obesity.

F.    DID THE ALJ APPLY THE CORRECT SEVERITY STANDARD?

To evaluate whether a claimant's medical condition qualifies as a "severe impairment" at Step Two of the analysis, the Commissioner has issued regulations that define a "severe impairment" as one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."[61]  The Fifth Circuit, however, has held that a literal application of that definition is inconsistent with the statutory language and legislative history of the Social Security Act.[62]  Therefore, in *Stone v. Heckler*, the Fifth Circuit established the following standard for determining whether a claimant's impairment is severe:  an impairment is not severe only when it is a

---

[61]    20 C.F.R. §§ 404.1520(c), 416.920(c), 404.1521 ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.").

[62]    *Stone v. Heckler*, 752 F.2d 1099, 1104–05 (5th Cir. 1985).

-17-

"slight abnormality" having "such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education[,] or work experience."[63]   In this case, the ALJ cited the appropriate standard at the very end of her ruling, but stated the incorrect standard in making her decision at step two of the sequential analysis, where she said:  "The claimant does not have an impairment or combination of impairments that has significantly limited (ore is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant does not have a severe impairment or combination of impairments."[64]  The ALJ then terminated her analysis and did not consider the evidence or make any findings at steps three, four, or five.

Review of the ALJ's decision shows that, although the ALJ cited *Stone* and the correct severity standard articulated in the *Stone* decision, her finding at step two does not cite *Stone* or the Fifth Circuit's standard for determining the severity of an impairment.  Instead, the ALJ cited the language of the regulation rather than the language of *Stone*.  Thus, although the ALJ was aware of *Stone*, it is impossible to tell from her analysis and findings whether she applied the regulatory "significantly limits" standard or the correct "slight abnormality" and "minimal effect" rule of *Stone*

---

[63]      *Stone v. Heckler*, 752 F.2d at 1101.

[64]      Rec. Doc. 9-1 at 23.

to her evaluation of the claimant's impairments.  Because the ALJ terminated the analysis at step two with a finding of non-disability based on the non-severity of the claimant's impairments, and the court is unable to discern whether the ALJ applied the correct legal standard to make this determination, reversal and remand are necessary.

## G.  DID THE ALJ ERR IN FINDING THAT THE CLAIMANT HAS NO COMBINATION OF IMPAIRMENTS WITH MORE THAN MINIMAL EFFECTS?

The ALJ addressed the severity of each of the claimant's impairments, but did not explain how the combination of the claimant's various impairments have only a minimal effect on the claimant and would not be expected to interfere with her ability to work.  The ALJ included a single conclusory statement regarding the combination of impairments, stating that "the claimant's physical and mental impairments, considered singly and in combination, do not significantly limit the claimant's ability to perform basic work activities."[65]  The ALJ did not explain how she reached that conclusion regarding the combination of impairments.  This was error.  An "ALJ is required to discuss the evidence and explain the basis for his findings at each unfavorable step of the sequential evaluation process."[66]  Although the Fifth Circuit

---

[65]     Rec. Doc. 9-1 at 30.

[66]     *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007); 42 U.S.C. § 405(b)(1).

-19-

was addressing a step three finding when it articulated this principle, this Court finds that the principle is equally applicable to the ALJ's step two finding in this case. Because the ALJ did not explain the basis for her decision that the combination of Ms. Harmon's impairments is not severe, it is impossible for the court to determine whether the ALJ applied the correct legal standard or whether the finding is supported by substantial evidence.  A more thorough explanation of the basis for this finding is necessary.[67]  Accordingly, reversal and remand are appropriate.

## H.   DID THE ALJ ERR IN EVALUATING THE SEVERITY OF THE CLAIMANT'S MENTAL IMPAIRMENT?

The ALJ erred in evaluating the severity of the claimant's mental impairment. Dr. Lucy Freeman, the psychologist who conducted a consultative examination of the claimant, found that Ms. Harmon has a major depressive disorder, recurrent, moderate.  Dr. Freeman also found that Ms. Harmon was able to understand and follow simple directions, to remain focused, to maintain concentration, and demonstrated good insight and judgment.[68]  The ALJ correctly cited these findings in her ruling.  The ALJ also correctly noted that Dr. Freeman found Ms. Harmon to have a GAF score of 60.  According to the ALJ this score "indicates no more than

---

[67]    *Reyes v. Astrue*, No. SA-07CA0389-XR, 2008 WL 2225672, at *4 (W.D. Tex. May 28, 2008).

[68]    Rec. Doc. 9-2 at 528-530.

mild functional impairment across the board."[69]  That is incorrect.  Although Global

Assessment of Functioning scores do not have a direct correlation to the severity

requirements in the mental disorders listings,[70] they can be helpful in evaluating a

claimant's condition.  A GAF score of 60 indicates moderate symptoms or moderate

difficulty in social, occupational, or school functioning.[71]  Nevertheless, the

Commissioner repeated the ALJ's error in this regard in her briefing, stating:

> The ALJ properly determined, based on Dr. Freeman's
> GAF rating that Plaintiff experienced no more than "mild
> functional impairment across the board.  A GAF score of
> 61 through 70 indicates, one point higher than Dr.
> Freeman's assessed GAF of 60, indicates only "[s]ome
> mild symptoms. . . or some difficulty in social,
> occupational, or school functioning. . ., but generally
> functioning pretty well, [and] has meaningful interpersonal
> relationship."[72]

This argument is an after-the-fact attempt to justify the ALJ's error and suggests that

Dr. Freeman meant to characterize Ms. Harmon's functionality as better than Dr.

Freeman actually found it to be.  If Dr. Freeman had found Ms. Harmon's GAF score

to be a 61, she would have assigned that score.  Neither error by the ALJ nor

---

[69]    Rec. Doc. 9-1 at 29.

[70]    *Kennedy v. Astrue*, 247 Fed. App'x 761, 766 (6th Cir. 2007); *Wind v. Barnhart*, 133 Fed. App'x 684, 691-92 n. 5 (11th Cir. 2005).

[71]    Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) (4th ed.) at 32.

[72]    Rec. Doc. 12 at 7 (internal citation omitted).

argument by the Commissioner can change the score from a 60 – signifying moderate difficulty in functioning – to a 61 – signifying mild difficulty in functioning. The ALJ erred in stating that this score means that the psychologist found Ms. Harmon to have only a mild mental impairment.

The ALJ made another error in evaluating Ms. Harmon's mental impairment. The special technique for evaluating mental impairments requires analysis of claimant's functionality in four domains: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. The ALJ found that Ms. Harmon has no more than mild restrictions in the first two domains because she "can visit, talk on the phone, shop, perform child care, and engage in a wide range of routine household tasks including self-care."[73] The evidence in the record does not support that conclusion. There is no evidence that Ms. Harmon can or does visit or talk on the phone with friends or family, although her treating physician, Dr. Cannon, did suggest that she would be capable of performing telephone-oriented work.[74] There is no evidence in the record demonstrating that Ms. Harmon shops, performs child care, or engages in a wide range of routine household tasks, although she did testify that she performs her own grooming. Dr. Freeman found that Ms. Harmon

---

[73]     Rec. Doc. 9-1 at 29.

[74]     Rec. Doc. 9-2 at 450.

"has difficulty completing activities of daily living due to pain and depression.  Her children and her family help her routinely."[75]  Consistently, Ms. Harmon testified at the hearing that she leaves her house only for occasional grocery shopping – with her daughter's assistance – and for doctor's appointments.  She stated that she does not engage in any other type of outside activities.  She does not eat out, and she does not attend church.  She testified that she gets panic attacks in crowds.  She stated that her son and daughter do the household chores and that when she has a good day and tries to wash the dishes, she must have a chair behind her because her back tends to gets weak.  Furthermore, Dr. Cannon advised that Ms. Harmon has severe anxiety that can lead to panic attacks when she is in stressful situations, in enclosed spaces, or in large crowds of people.[76]  He stated that her anxiety can also be triggered by traffic and stressful driving situations.[77]  Thus, there is at least one component of Ms. Harmon's mental impairment – the anxiety component – that her treating physician has described as severe, and Dr. Cannon related Ms. Harmon's anxiety to activities of daily living and to social situations.  Thus, the record lacks factual support for the ALJ's conclusion that Ms. Harmon has only a mild impairment in the domains of

---

[75]     Rec. Doc. 9-2 at 530.

[76]     Rec. Doc. 9-2 at 450.

[77]     Rec. Doc. 9-2 at 450.

-23-

activities of daily living and social functioning.  Accordingly, the ALJ's conclusion that Ms. Harmon's mental impairment is not severe also lacks factual support.

## I.   DID THE ALJ ERR IN FAILING TO OBTAIN VOCATIONAL EXPERT TESTIMONY?

The claimant contends that the ALJ erred by failing to elicit testimony from a vocational expert concerning her ability to maintain regular employment.  The ALJ's ruling was made at step two.  Therefore, it was not necessary for the ALJ to obtain testimony from a vocational expert.  This assignment of error lacks merit.

## J.   DID THE ALJ ERR IN EVALUATING THE CLAIMANT'S OBESITY?

The claimant contends that the ALJ erred in evaluating the effect of her obesity on her functionality.  Analysis of this assignment of error is subsumed in this Court's decision that the ALJ's ruling should be remanded for an evaluation of the severity of the combination of all of the claimant's impairments.  Therefore, further discussion of this assignment of error is pretermitted.

## CONCLUSION AND RECOMMENDATION

This Court cannot determine whether the ALJ applied the appropriate legal standard in ruling on the severity of Ms. Harmon's impairments.  Additionally, this Court finds that the ALJ's findings with regard to the severity of Ms. Harmon's mental impairments are not based on substantial evidence in the record.  Accordingly,

**IT IS RECOMMENDED** that the decision of the Commissioner be **REVERSED and REMANDED** to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to (1) develop the record with regard to the severity of Ms. Harmon's impairments by obtaining a function report either from a consultative examiner or from Dr. Cannon and by permitting the claimant to supplement the record with any relevant evidence; (2) properly evaluate the severity of each of the claimant's impairments and the combination of her impairments, including but not limited to her obesity, (3) evaluate the claimant's residual functional capacity, and (4) if appropriate, to continue the sequential analysis through all five steps.

Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).[78]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after

---

[78]      See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir.1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

-25-

receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error. See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Signed in Lafayette, Louisiana, this 17th day of November 2015.

_____

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

COPY SENT:

DATE: __11/17/2016__
BY: _____EFA_____
TO: _____RFD_____
cg

-26-